IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

| | |
|---|---|
| LISA SUITT,<br><br>     Plaintiff,<br><br>vs.<br><br>HONEYWELL CONSUMER PRODUCTS GROUP,<br><br>     Defendant. | MEMORANDUM DECISION AND ORDER<br><br>Case No. 1:07-CV-00016DAK<br><br>Judge Dale A. Kimball |

      This matter is before the court on Defendant Honeywell Consumer Products Group's (Honeywell) Motion for Summary Judgment.  The court held a hearing on the motion on March 11, 2008.  At the hearing, Michael P. Studebaker represented Plaintiff Lisa Suitt and Scott M. Petersen and David N. Kelley represented Honeywell.  Following the hearing, the court took the matter under advisement.  Now, having carefully considered the memoranda and additional materials submitted by the parties, as well as the relevant law and facts relating to the motion, the court renders the following Memorandum Decision and Order.

## BACKGROUND

      In 1994, Honeywell, which owns and operates an oil and air filter manufacturing plant in Clearfield, Utah, hired Suitt as a production worker.  Suitt is an African-American woman.  In

1999, Honeywell promoted Suitt to the position of production facilitator for the "three-inch bottom assembly line" (3" Line).

As a production facilitator, Suitt was responsible for normal production worker duties, as well as the additional duties of ensuring that other employees were on the floor on time, had completed all of their production line checks, and were wearing safety equipment. Suitt was also responsible for assuring the line was producing the proper parts, for reporting workers' time and attendance, and for performing machinery checks at regular intervals.

On approximately April 2, 2002, Honeywell gave Suitt a verbal warning concerning her job performance. The parties dispute when the events precipitating the warning occurred, but Honeywell gave Suitt the warning for creating a difficult working environment for her team, for failing to properly bring instances of policy violations to her supervisor's attention, for failing to work with others on the production line to resolve problems, for making complaints to line workers about not receiving support from plant leadership, and for difficulty getting along with others.

On April 3, 2002, Honeywell gave Suitt a second warning, this time in writing, for failing to follow control plans and make requisite machinery checks. Honeywell alleged that on March 12, 2002, Suitt's failure to make the requisite machinery checks resulted in a substantial loss of product.

In response to Honeywell's warnings, Suitt sought clarification of the company's stated justifications. Suitt further testified that she thought it impossible to follow control plans and simultaneously handle employee problems.

In September 2002, Honeywell began producing large amounts of three-inch air filters,

and the 3" Line entered seven-day production. Because Honeywell policy permitted employees to earn overtime when they worked more than forty hours a week—time and a half for the first eight hours over forty and double time for any additional hours—some employees, including Suitt, wanted to work overtime.

Although in the past Honeywell had permitted employees scheduled for overtime to self-adjust their overtime schedules by making arrangements for another employee to take their shift, this policy was causing problems because there were times when no employee would show up for a shift, resulting in no coverage for that shift. To avoid this problem, as well as to reduce the amount of double overtime and to provide overtime to employees on the three and five-eighths line (3 5/8" Line), Honeywell instituted a policy whereby the 3" Line employees worked one day of overtime, and the 3 5/8" Line employees worked one day of overtime on the 3" Line. By instituting this policy, both lines were able to work six days a week and receive one day of overtime.

Suitt claims that Honeywell supervisors had informed her that she could have all the overtime she wanted and that Honeywell's employee handbook dictated that overtime distribution be based on seniority. Honeywell's employee manual provides that

> our practice is to offer overtime opportunities to those who are performing the same or similar work, and who desire the overtime. . . . We make a reasonable effort to distribute overtime among the employees performing the same or similar work in the same department and shift. Questions regarding the distribution of overtime should be addressed by [the employee's c]oach. If [the employee] does not receive an acceptable answer, please advise the department manager.

Suitt's coach at the time, Eric May, and May's direct supervisor, manager Dan Olsen, did not give Suitt permission to work overtime seven days a week.

On September 13, 2002, Suitt showed up for work, despite not being scheduled to work that day. Yun Clark, the 3 5/8" Line tapper operator was scheduled to work overtime on the 3" Line shift. When Clark arrived, Suitt was working Clark's shift. Suitt told Clark to go home. Clark went home and later complained to her supervisor that Suitt had improperly worked her overtime shift.

The following week, on September 20, 2002, Clark again showed up at work to find Suitt working Clark's overtime shift. Suitt again told Clark to go home, and Clark proceeded to yell at Suitt for taking Clark's shift. Following this incident, May informed all line employees, including Suitt, that they could not change their scheduled overtime shift dates without his authorization.

On September 27, 2002, at the end of Suitt's shift, May expressly informed Suitt that she was not scheduled to work overtime that night. Suitt, however, proceeded to show up for work that evening. There had been no scheduling change in the interim period, and Clark was scheduled to work that evening's overtime shift. When May confronted Suitt about working Clark's overtime shift, Suitt said that she did not think the overtime policy, earlier explained by May to all line employees, applied to her. Both May and Olsen explained to Suitt that the overtime scheduling policy was designed to eliminate double-time pay, to prevent a seven-day work week, and to avoid employee confusion as to which employees were working a given shift. May and Olsen both testified that Suitt would not listen and continued to argue that she was entitled to overtime. Suitt was told to go home.

Because Honeywell had given Suitt two prior warnings in April 2002, May prepared a final warning and reviewed the warning with Suitt, as well as with human resources. The final

warning states that it is issued on the basis of "unacceptable performance." Specifically, the warning discusses Suitt's reporting for unauthorized shifts and her ignoring general instructions from May that employees were not allowed to switch or cover other shifts, as well as specific instructions from May that Suitt was not to report to work on September 27, 2002. The final warning further provides that failure to adhere to the warning will result in additional disciplinary action that may include termination.

In April 2003, Honeywell instituted an organizational change that eliminated the position of production facilitator from each of the production lines and instead created two "line-leads" for each shift. At this time, Suitt's direct supervisor, or coach, was Jason Adams. Adams reported to Justin Bills.

To determine which employee to appoint to line-lead position, Bills interviewed all interested candidates, including Suitt. Honeywell explained that because Suitt was on her final warning, she was not eligible for the line-lead position. Bills hired Victoria Foy.

Several weeks later, in May 2003, several of Suitt's coworkers complained to Bills that Suitt had allegedly made derogatory statements about Foy and had suggested that Foy only received the line-lead position because of her physical appearance. In conducting an investigation into these complaints, Bills learned from Suitt's coworkers that Suitt had yelled at and threatened another employee and this employee feared for her own safety; that Suitt had indicated that she no longer wanted to work the line, had stated that she was not interested in helping her team, and had, at least once, expressly refused to help the team; that Suitt was making disrespectful comments about Honeywell and its management; that Suitt was taking longer breaks than allowed and was refusing to go on break when instructed; that Suitt was using

foul, lewd language, often in reference to Foy; that Suitt was engaged in gossip about other employees; and that Suitt's behavior was having a negative impact on the other workers on the line. Adams testified that when he spoke to Suitt about missing team meetings, Suitt became "very defensive" and refused to listen, making communication very difficult.

Honeywell standards of conduct, set forth in the company's employee handbook, prohibit "[d]isorderly conduct . . . including but not limited to . . . abusive language or threats"; "[h]arassment of any kind"; "[i]nsubordination"; and "[m]alicious gossip or false accusation which tends to destroy friendly relations between the [c]ompany and its employees, between employees themselves, or which in any way hinders production or disrupts or prevents any employee from performing his/her job." The handbook states that violations of its standards of conduct may result in disciplinary measures, including termination.

On June 17, 2003, Honeywell terminated Suitt's employment. The company based its termination decision on Bills's investigation, his determination that Suitt had violated the Honeywell standards of conduct, and the company's progressive disciplinary policy that provides for termination of employees who have a verbal, written, and final warning remaining on their record at the time of the fourth disciplinary action. Documented warnings remain active on an employee's record for one year, "assuming no further disciplinary action" is taken by the company during this twelve-month period.

Suitt admits that over the course of her employment with Honeywell, she did not have access to a company supply room, but that she never asked for access to the supply room and production facilitators do not have access to all company areas. Suitt also admits that she never saw nor heard about Honeywell ever towing a car that was blocking an employee vehicle in the

company parking lot; that she had no resulting problems with a supervisor returning her social security number to her through another supervisor and without enclosing the number in an envelope; and that from 1999 through 2002, approximately three-fourths of Honeywell employees who shared Suitt's supervisors did not receive employee evaluations.

In early 2007, Suitt filed suit against Honeywell, alleging that the company unlawfully terminated her on grounds of race, color, and gender.  Honeywell now moves for summary judgment on Suitt's claim that she was unlawfully terminated because of her race, color, and gender.  Honeywell asserts that Suitt cannot make a prima facie showing of discrimination and, even if she satisfies her prima facie burden, fails to demonstrate that Honeywell's reasons for terminating her were pretextual.[1]

## DISCUSSION

In her Complaint, Suitt alleges that Honeywell violated Title VII in terminating her employment because of her race, color, and gender.  *See* 42 U.S.C. § 2000e-2(a)(1) (2003).  Honeywell disputes this claim and moves for summary judgment on grounds that it has

---

[1] Honeywell also moves for summary judgment on Suitt's claim that "Honeywell retaliated against [her] by subjecting [her] to unjust discipline and firing Suitt solely because she had reported sexual harassment of herself."  Neither parties' statements of undisputed fact, however, reference Suitt reporting an incident of sexual harassment.  Nor do the parties elaborate on Suitt's sexual harassment complaint in their briefing.  In fact, in her retaliation analysis, Suitt, merely informs the court that it can apply the *McDonnell Douglas* burden shifting analysis and refers the court to her statement of facts.  As recently made clear by this court, "'[I]t is not the job of the court to construct a party's arguments for him.'" *Burrell v. Utah Dep't of Workforce Servs.*, No. 1:06-CV-00091, 2008 WL 341496, at *9 (D. Utah Feb. 5, 2008) (quoting *Trugreen Companies, LLC v. Scotts Lawn Serv.*, 508 F. Supp. 2d 937, 952  (D. Utah 2007)).   Such conclusory briefing by Suitt makes it impossible to conclude that Suitt has satisfied her burden of demonstrating, by a preponderance of the evidence, a prima facie case of retaliation, much less pretext.  Accordingly, summary judgment on Suitt's retaliation claim is appropriate.

evidenced legitimate, nondiscriminatory reasons for Suitt's discharge and Suitt has proffered no evidence showing that these nondiscriminatory reasons were a pretext for racial, color, or gender discrimination.

Pursuant to Federal Rule of Civil Procedure 56(c), "[s]ummary judgment is appropriate if the record shows 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *True v. United States*, 190 F.3d 1165, 1171 (10th Cir. 1999) (quoting Fed. R. Civ. P. 56(c)).  Under this standard, "[a] fact is 'material' if under the substantive law it could have an effect on the outcome of the lawsuit." *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246  (10th Cir. 2000).  "An issue is 'genuine' if 'a rational jur[or] could find in favor of the nonmoving party on the evidence presented.'" *Id*. (alteration in original) (quoting *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000)).  In reviewing a motion for summary judgment, the court "view[s] the factual record and draw[s] any reasonable inferences therefrom in the light most favorable to the nonmoving party." *Id.*

Title VII enjoins an employer from discharging an employee on grounds of race, color, or gender.  *See* 42 U.S.C. § 2000e-2(a)(1).  A plaintiff bringing a Title VII race, color, or gender discrimination claim may prove intentional discrimination by direct or indirect—"i.e., circumstantial"—evidence.  *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1225 (10th Cir. 2000).  In cases "[w]here, as here, an employee's . . . discrimination claim relies exclusively on circumstantial, rather than direct, evidence, [the court] appl[ies] the burden-shifting scheme of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 [1973]."[2]  *Timmerman v. United*

---

[2] At oral argument, Suitt conceded that no direct evidence of discrimination exists in this case.

*States Bank N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007); *see also English v. Colorado Dep't of Corrections*, 248 F.3d 1002, 1007 (10th Cir. 2001) (explaining that the court "review[s] plaintiff's] case for indirect evidence of racial discrimination under the burden-shifting approach established by *McDonnell Douglas*").

Under the *McDonnell Douglas* framework, the plaintiff "bears an initial burden of establishing a prima facie case intended to eliminate the most common nondiscriminatory reasons that might account for the adverse employment action." *English*, 248 F.3d at 1008. If the plaintiff "establish[es] a prima face case, the burden then 'shift[s] to the employer to articulate some legitimate, nondiscriminatory reason' for taking an adverse employment action against the plaintiff." *Id*. (second alteration in original) (citation omitted). "The employer's articulation of a legitimate, nondiscriminatory reason for the adverse employment action causes the presumption of discrimination attendant to the prima facie showing of discrimination 'to simply drop[] out of the picture.'" *Timmerman*, 483 F.3d at 1113 (alteration in original) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)). Thus, if the employer "successfully meets its burden of production, the burden shifts back to the plaintiff to put forth evidence sufficient to allow a jury to find that the defendant's reason [for the adverse employment action] is pretextual, e.g., that it is unworthy of belief." *English*, 248 F.3d at 1008 (emphasis omitted). A successful showing of pretext "enables a plaintiff to survive summary judgment." *Timmerman*, 483 F.3d at 1113. A plaintiff must prove both her prima facie case and pretext by a preponderance of the evidence. *See Jaramillo v. Colorado Judicial Dep't*, 427 F.3d 1303, 1307 (10th Cir. 2005) (*en banc*) (*per curiam*) (pretext); *EEOC v. Horizon*, 220 F.3d 1184, 1191 (10th Cir. 2000) (prima facie case).

A.  **Suitt's Prima Facie Case**

For a plaintiff to satisfy his or her prima facie burden in a discriminatory discharge case, the plaintiff must show that "'(1) [s]he belongs to a protected class; (2) [s]he was qualified for [her] job; (3) despite [her] qualifications, [s]he was discharged; and (4) the job was not eliminated after [her] discharge.'" *English*, 248 F.3d at 1008 (quoting *Kendrick*, 220 F.3d at 1229 (holding that in discriminatory discharge cases, it is not necessary for a plaintiff to show that he was treated less favorably than those outside the protected class to satisfy prima facie burden)). Concerning the fourth and final element, the Tenth Circuit recently held that in a discriminatory discharge case, the status of the employee's former position is irrelevant if the employer's reason for termination is unsatisfactory conduct. *See Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005).

Here, Honeywell does not dispute that Suitt is a member of a protected class. Nor does the company dispute that Suitt was qualified and that the company disciplined and eventually terminated her.[3] The court therefore concludes that Suitt has met her prima facie burden and next considers whether Honeywell has articulated a legitimate, nondiscriminatory reason for terminating Suitt.

---

[3] Honeywell does dispute whether Suitt was treated differently than nonprotected, similarly situated employees. But, as noted, the Tenth Circuit has "held that a plaintiff does not have to show differential treatment of persons outside the protected class to meet the initial prima facie burden under *McDonnell Douglas*." *English v. Colorado Dep't of Corrections*, 248 F.3d 1002, 1008 (10th Cir. 2001) (citing *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1228-29 (10th Cir. 2000)).

### B.     Honeywell's Burden

Because Suitt has established a prima facie case, the burden "'shift[s] to [Honeywell] . . . to articulate some legitimate, nondiscriminatory reason' for taking an adverse employment action against [Suitt].'" *English*, 248 F.3d at 1008 (first alteration in original) (quoting *McDonnell Douglas*, 411 U.S. at 802).  At this point, Honeywell "does not 'need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion.'" *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th Cir. 2007) (quoting *EEOC v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992)).  Instead, Honeywell "need only 'explain its actions against [Suitt] in terms that are not facially prohibited by Title VII.'" *Id.* (quoting *Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000)).

Honeywell explains that it issued an initial verbal warning to Suitt in April 2002 for creating a difficult working environment for her team, failing to properly bring instances of policy violations to her supervisor's attention, failing to work with others on the production line to resolve problems, making complaints to line workers about not receiving support from plant leadership, and difficulty getting along with others.  That same month, Honeywell issued a second warning to Suitt, this time in writing, for failure to make the requisite machinery checks, resulting in a substantial loss of product.  In October 2002, Honeywell delivered a final warning to Suitt for unacceptable performance---specifically, reporting for unauthorized shifts and insubordination.  Seven months later, in May 2003, Honeywell received several complaints about Suitt's behavior from her coworkers.  After investigating these complaints, Honeywell determined that termination was appropriate.

The court concludes that Honeywell has satisfied its burden of setting forth explanations for its discipline and termination of Suitt that do not facially violate Title VII. *See, e.g.*, *Jones*, 203 F.3d at 753 (determining that the employer met its burden where its explanation for its adverse action was plaintiff's "history of problems [with the employer]"; the p]laintiff's "[receipt of] both verbal and written warnings"; and the employer's receipt of "specific complaints about his performance"); *Brown v. Parker-Hannifin Corp.*, 746 F.2d 1407, 1411 (10th Cir. 1984) (stating that "insubordination [can] serve as a legitimate non[]discriminatory reason for discharge to rebut the plaintiff's prima facie case" (emphasis omitted)); *Crumpacker v. Kansas Dep't of Human Resources*, 205 F. Supp. 2d 1209, 1216 (D. Kan. 2002) (providing that "poor performance and inability to get along with others" are legitimate, nondiscriminatory reasons for terminating). Accordingly, the burden shifts back to Suitt to evidence that Honeywell's proffered reasons are pretextual.

C.  **Pretext**

"Once [Honeywell] has advanced a nondiscriminatory reason for [Suitt's] termination, the burden shifts back to [Suitt] to 'show there is a genuine issue of material fact as to whether the proffered reason . . . [is] pretextual.'" *Etsitty*, 502 F.3d at 1225 (quoting *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005)). "Pretext exists when an employer does not honestly represent its reasons for terminating an employee." *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005). "'A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered reason is unworthy of credence.'" *Id.* (quoting *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1218

(10th Cir. 2003)).  A plaintiff can do this by evidencing "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's claimed legitimate, non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief." *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).  A plaintiff may also show pretext "by providing evidence that he was treated differently from other similarly-situated, nonprotected employees." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000).  "Failure to come forward with evidence of pretext will entitle [the employer] to [summary] judgment."  *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 529 (10th Cir. 1994); *see also Timmerman*, 483 F.3d at 1113 ("Demonstrating pretext enables a plaintiff to survive summary judgment.").

Importantly, in evaluating pretext, the court "look[s] at the facts as they appear to the person making the decision to terminate plaintiff."  *Kendrick*, 220 F.3d at 1231.  Thus, "the 'relevant inquiry is not whether [Honeywell's] proffered reasons were wise, fair[,] or correct, but whether [Honeywell] honestly believed those reasons and acted in good faith upon those beliefs.'"  *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004) (citation omitted).  It is well established that "when analyzing the pretext issue, [courts] do not sit as 'super-personnel departments.'"  *Bullington v. United Airlines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) (additional quotations and citation omitted).  The court's "role is not to second guess an employer's business judgment."  *Stover*, 382 F.3d at 1076; *see also Young v. Dillon Companies, Inc.*, 468 F.2d 1243, 1250 (10th Cir. 2006) (explaining that court's role is not to "second guess[] employers' honestly held (even if erroneous) business judgments").

Here, Suitt makes several contentions in support of her pretext claim.  To begin, Suitt argues that Honeywell's stated reasons for her termination are inaccurate and unfair.  In support of this contention, Suitt relies on her own testimony stating that she considered herself a good employee and on a coworker's testimony that she perceived Suitt to care about the employees.

But, in suggesting her and her coworker's testimony intimates pretext, Suitt ignores that "'it is the manager's perception of the employee's performance that is relevant [in pretext determinations], not plaintiff's subjective evaluation of his own relative performance.'" *Kelley v. Goodyear Tire & Rubber Co.*, 220 F.3d 1174, 1177-78 (10th Cir. 2000) (quoting *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996)).  "[A plaintiff's] opinions about the fairness or accuracy of . . . evaluations is not evidence of pretext," *Bullington*, 186 F.3d at 1318.  Thus, the problem with Suitt's reliance on her "own testimony regarding [her] work and the conclusory testimony of [another worker] at [Honeywell] who considered [Suitt] a good performer," is that it only demonstrates "general disagreement[]" as to Honeywell's evaluation of Suitt's performance.  *Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 747 (10th Cir. 1991).  The Tenth Circuit's "view is that a plaintiff cannot prevail by merely challenging in general terms the accuracy of a performance evaluation which the employer relied on in making an employment decision without any additional evidence (over and above that of the prima facie case) of . . . discrimination."  *Id*.  "To show pretext, the plaintiff must call into question the honesty or good faith of the [employer's] assessment of his abilities."  *Exum v. United States Olympic Comm.*, 389 F.3d 1130, 1137 (10th Cir. 2004).

In support of her pretext claim, Suitt also references several instances that she suggests evidence that she was treated differently than similarly situated nonprotected employees.

14

Specifically, Suitt argues that although Honeywell refused to do it for her, the company took initiative to tow any cars that prevented any nonprotected employee from leaving the parking lot; that unlike a male mechanic on her team, Suitt did not receive a key to a supply room; that unlike a male employee whose social security number was returned directly to him in an envelope, Suitt's number was returned to her without an envelope and through another Honeywell supervisor; that unlike other employees, Suitt was not allowed to work another employee's assigned overtime hours; that unlike other employees, Suitt received no employee evaluation from 1999-2002; and that Foy was not disciplined for timecard misuse.

     These instances, however, fail to demonstrate that Suitt received differential treatment. First, and primarily, there is no indication that these alleged instances involve similarly situated employees. Although Suitt asks this court to define "similarly situated" broadly to include any employee working for the company, such an interpretation contravenes established Tenth Circuit law. The Tenth Circuit has held that "[a]n employee is similarly situated to the plaintiff if the employee deals with the same supervisor and is subject to the 'same standards governing performance evaluation and discipline.'" *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1232 (10th Cir. 2000) (quoting *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1404 (10th Cir.1997)). Second, Suitt admits that she never saw or heard of Honeywell ever towing a car under circumstances similar to hers. Third, Suitt acknowledges that the male who received a key to the supply room was a mechanic, not a production facilitator; that she never asked Honeywell for a key to this room; and that facilitators do not have keys to all company areas. Fourth, Suitt does not provide any information, besides gender, as to the male employee whose social security number was returned to him in an envelope, and she admits that no harm resulted from her

supervisor passing the information along without an envelope. Fifth, Suitt concedes that Honeywell restricted all employees from working other employees' overtime shifts. Sixth, Suitt does not dispute that Honeywell refrained from giving evaluations to three-fourths of its employees, not just Suitt, from 1999-2002. Finally, Suitt gives no indication that Foy's alleged timecard misuse has any relevance to Suitt or that Honeywell was even aware of such misuse.

In sum, Suitt has not demonstrated any genuine issue of material fact exists as to pretext. Because Suitt fails to satisfy her pretext burden, summary judgment is appropriate.

## CONCLUSION

Honeywell's Motion for Summary Judgment is GRANTED. The court dismisses Suitt's claims with prejudice and orders each party to bear their own costs.

DATED this 17th day of March, 2008.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge